Massaglia v. Andrew M. Saul is our third case for argument this morning. Mr. Duncan. May it please the Court. Good morning, Your Honors. Dana Duncan on behalf of Maria Terri Massaglia. Ms. Massaglia had a claim for disability insurance benefits, which was denied by the commissioner. The final decision is before the Court. Standard of review is the substantial evidence standard, which the Court has addressed in the previous two arguments. But I would like to note that there is something that seems to be suddenly falling out of the equation in judicial review. And that is, and I'll quote from the T-Mobile v. City of Roswell case, the Supreme Court rule. By employing the term substantial evidence, Congress has invoked, among other things, reviewing courts' recognition that the orderly functioning of the process of substantial evidence review be clearly disclosed and that courts cannot exercise their duty of substantial evidence review unless they are advised of the considerations underlying the action under review. And it brings back my memories of tutoring Russian history students in college almost 40 years ago, that it's not what you say, but how well you support it. And that's one of the issues lost in the review process at the current time and something that the commissioner's office, when they're arguing categorical rules, seems to fail to note that they are the ones applying the categorical rules by not showing that the administrative law judge properly supported this case. This case is involving two issues, whether the ALJ erred by providing a perfunctory analysis of the listing at 1.04, specifically failing to address significant evidence developed after the state agency physicians assessed the listing, and whether the administrative law judge provided a flawed assessment of her credibility as it relates, again, to the development of evidence after the state agency physicians. In that timing argument that you're offering, counsel, the operative date for you is April 2015? Correct, Your Honor. Dr. Khurshidi entered her assessment December 18th of 2014. That was followed up by Dr. Walcott from the state agency on April 8th of 2015. And if we review the evidence, and again, let me just point out, you can look at both briefs, my brief and the commissioner's brief, there is tons of facts in this case, favorable and unfavorable. But ultimately the question comes down to this, which is we have a claimant who June 20th, 2016, had an MRI noting protrusions with marked lateral or right lateral recess with mild neuro-hormonal narrowing, herniation found by Dr. Charles Watt reviewing it on June 22nd, causing compression of the sacral nerve root on the right. She undergoes a disectomy on July 8th of 2016. She freaks by September 29th. She's reporting her symptoms have returned. She was noticeably uncomfortable, had difficulty walking toe to heel. MRI in October of 2016 showed small central disc protrusion, again at L5-S1 with scar tissue around the S1 nerve root. I don't think using phrases like F1 nerve root really helps judges of the generalist court. Sacral, or the sacral nerve root, excuse me. And what we end up with is all of this evidence that has never been evaluated by a medical practitioner to determine what impact this has on the elements of the listing or on whether or not her condition had improved, as the administrative law judge had said. Obviously, both sides have highlighted the facts supportive of their cases, but the truth of the matter is whether or not somebody is comfortable believing that an administrative law judge can adequately review this medical evidence and determine what impact it has on whether or not the claimant meets a listing and whether it undermines her credibility. Without having any kind of medical opinion whatsoever. We're talking about two years worth of medical treatment from the date the last state agency review took place until the judge's decision. Now, this court has said that an ALJ may not substitute their judgment for physicians without relying on other medical evidence of record. Well, if you relied on this evidence, he's interpreting what it means because I don't know how you can look at an MRI result knowing that there is nerve root compression without somehow coming to terms whether or to the idea of whether this is indeed causing the problems, the reported pain she's expressing, whether it meets the listing unless you're interpreting it. And this court has repeatedly, in fact, Moreno and Atkins are the two most recent cases where they've talked about that if the state agency's opinion is undermined, an ALJ is supposed to actually obtain medical opinions to address the issue. They're not allowed to play doctor. In this case here, we determined that all of the evidence outlined, and I laid it out in my brief, I made my prima facie case that the listing was met by the evidence. I noted that she had pain, that there was noted problems with her nerve root, that she had positive straight leg raises. That's not saying that she wins. That's just simply saying that we made our prima facie case. The ALJ, or excuse me, the administrative law judge's duty then is to rebut that presumption. And in this case, there's so much evidence sitting here. Where is the rebutted presumption that the listing was met, considering all of this evidence that was really never properly evaluated or taken into consideration? With regard to the listing, this is no different than the court's interpretation in Minick, where the court outlined the only differences is in Minick, the judge actually outlined the elements of listing 1.04. But in this case, the judge just said simply, I've considered it and found that it doesn't apply. There's no effort to assess the record, no effort to point to the evidence and show how the specific elements are met. There's just a very perfunctory analysis. As far as the credibility, again, we have a problem in the fact that she's reporting that she had a left nerve damage, foot drop, that she needed to lie down and elevate her legs to relieve pressure on her spine. The vocational expert's testimony at record page 121 noted that such a limitation would preclude competitive work. Yet, she's repeatedly noted as having an improvement in her medical condition, despite the fact that shortly before the hearing, she's again receiving steroid injections in her low back due to her pain. The ultimate question, Your Honors, is whether the vast amount of additional evidence developed after the case merited some review by a medical expert. And it did. It just was not within the purview of the administrative law judge to assess that evidence and determine what impact that had either on the listing or his determination of credibility, ultimately leading to the determination of the residual functional capacity. And I'll be point blank. If Your Honors feel comfortable with an ALJ interpreting that evidence and feel it was sufficient, then I lose. I don't believe that it is. I will reserve the rest for rebuttal. Thank you. I'll hold 20 seconds of it, Counsel. Ms. Gibbons. Good morning, Your Honors. May it please the Court. My name is Katherine Gibbons, and I'm here on behalf of the Commissioner of Social Security. Your Honors, this morning I would like to emphasize two points. First, listing cases are extreme cases, though we see these arguments very often. Listing cases are the rare exception because it is a presumption of disability. The evidence is so clear that we skip the entire rest of the analysis and say that this person is presumptively disabled at step three. And here, that evidence just— Why do you describe listing cases as unusual? The grid also marks people as disabled. A given condition may mark somebody as disabled at age 56 but not at age 55. True. Just a lot of things work that way. True. Just that the emphasis is that it's a very high standard so that you're not going on to look at the rest of the evidence. I don't know why it's a high standard. It's just what it is. There's a listing. If you meet it, you meet it. True. There isn't supposed to be a thumb on the scale. It's just that typically if these cases are—you see more severe evidence. That's why instead of going on to look at a detailed factual analysis of what the claimant could or could not do in steps four and five, these cases, the more significant cases, get decided at step three where you don't go on to do that analysis. And here what we have, and I think the ALJ's decision emphasizes this, is we have an individual who had chronic back pain, and that back pain dated back to 2009, and she had two flare-ups. And the ALJ credited both of the flare-ups in the relevant time period. That was October of 2014 and then again in June 2016. In October 2014, she had a lumbar MRI that actually the doctor said didn't even really show anything significant. It was mostly normal. They said it was common for her age range. And then you see significant improvement right after with treatment at the chiropractor, with physical therapy, with medication. So in January, she's reporting multiple times that she's shoveling snow. She's saying she feels much better. And there's all of these activities throughout 2015 then that show she's doing yard work. She's taking care of her family. She's doing household chores. So we see improvement. And then she says on May 14, 2016, she's out mowing the lawn, and she tweaks her back. She stumbles. She tweaks her back. The MRI right after shows that she had that exacerbation. The ALJ discusses that. But she goes right into surgery. And then the follow-up three weeks later, she's reporting a 90% improvement in her symptoms. And so the ALJ, like I said, this isn't that she met the listing for a 12-month period. She met all of the criteria. The ALJ properly treated this as a chronic case and discussed the evidence related to that. And the second point is that the ALJ, the claimant challenges the ALJ's subjective symptom analysis. The ALJ largely credited what she said. And if you look at the residual functional capacity, the ALJ limited her to sedentary work, which was more than any medical opinion in the record. And he credited her complaints that she could only stand for 15 minutes at a time. He included a sit-stand option. He even gave her the use of the cane that she said that she needed for long distances or over rough terrain. So this really tracks with what she was saying she needed. Again, regarding the listing analysis, the appellant has emphasized this June 2016 MRI and then skips straight to the complaint of pain at the end of September, which is really the only other record, I think, after her surgery that shows that some of her symptoms have returned, that she had some complaints of pain. So in June 2016, she has the MRI. She has the surgery. She reports immediate and significant improvement. She has a little bit of pain at the end of September. She does another MRI, which shows that the disc herniation that had caused the nerve root compression in June is gone. Now there's some scarring, but the doctor says, and I think it's at page 623 in the record, that this is treated by physical therapy and doing some nerve glides, some dural flossing. He doesn't recommend surgery. He doesn't seem concerned about further follow-up. There might be another epidural steroid injection. But after this, we don't see those same complaints of pain that we saw in May and June 2016, and then again in late 2014. After this, we also have an opinion from her doctor, Ms. Cain, the nurse, in January 2017. And her doctor, this is evidence that she supplied, said she could lift up to 25 pounds and she needed some postural restrictions, I believe, and maybe some frequent position shifts. But other than that, that's the entire opinion that she provides in support that she should meet the listing. Plaintiff also seems to lower the burden in that she has not correctly stated the criteria. There's an emphasis on the nerve root compression and that she had pain, but the listing requires much more than that, which we've laid out in our brief. You need the diagnosis of the back impairment. You need to show you have nerve root compression lasting 12 months. You need to show neuroanatomical distribution of pain. I believe you need to show limitation in the range of motion, motor loss, accompanied by sensory and reflex loss, and then also the straight leg raising, so the positive straight leg raising test. So there are a number of things that she needed to show, and she has made no effort to point to that evidence. She just simply says that, well, there was this MRI in June 2016 that showed more significant degenerative changes, and so this should go back. It was her burden. It's plaintiff's burden to show that she met all of the criteria for at least a 12-month period, and she has not met that burden here. Finally, with regards to the subjective symptom analysis, again, the ALJ largely credited her complaints. Her arguments seem to be simply to ask this court to reweigh the evidence in her favor. Plaintiff, I don't believe, has cited any evidence that the ALJ ignored, and he gave multiple reasons for discrediting her complaints partially, which were consistent with the regulatory factors. He described the discrepancies between her complaints and the medical record, that her course of treatment did show significant improvement. This is her own reports. This isn't something the ALJ was reading into the record. There's repeated reports of how she is 40 percent, 50 percent better with medication and with physical therapy, and finally that her activities really were at odds with her allegations that she met a listing for disability throughout this period. Unless the court has any further questions? Thank you. Thank you, counsel. Anything further, Mr. Duncan? Briefly, Your Honor. That's guaranteed. With due respect to counsel, having to require surgery I think is more than a flare-up. As far as this goes, if we are going to allow claimants to have to refile claims because they have a worsening of their condition during the pendency, the long pendency. Thank you, counsel. Thank you. The case is taken under advisement.